Filed 7/28/21  P. v. Duran CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PABLO DURAN,<br><br>    Defendant and Appellant. | D077135<br><br>(Super. Ct. No. SCN374383) |

APPEAL from a judgment of the Superior Court of San Diego County, Carlos O. Armour, Judge.  Affirmed.

Cynthia Ann Grimm, by appointment of the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

Pablo Duran admitted bludgeoning Robert Pierro to death with a hammer and fleeing the scene but claimed he did so in self-defense. A jury found Duran guilty of first degree murder and attempted carjacking, and the court sentenced him to 26 years to life plus an additional four years six months in prison.

On appeal, Duran asserts the trial court improperly excluded evidence regarding the victim's propensity to violence and improperly admitted evidence regarding his own prior felonies and uncharged misconduct. He further asserts the court failed to instruct the jury that he had no duty to retreat before defending himself, failed to instruct the jury on heat of passion voluntary manslaughter, and provided an improper instruction regarding unanimity of the verdict. Further still, he alleges the prosecutor committed misconduct during the closing argument, his own counsel provided ineffective assistance of counsel, and that the cumulative nature of the asserted errors was prejudicial. We conclude each of these contentions lack merit and, to the extent there was any error, the error was harmless.

Finally, Duran requests that we independently review the trial court's decision in a sealed pretrial proceeding regarding the discoverability of certain evidence. We have done so and also find no error in that proceeding.

Accordingly, we affirm the judgement.

FACTUAL AND PROCEDURAL BACKGROUND

The victim, Robert Pierro, owned a construction company and had, at times, employed Duran as a skilled laborer.

On June 7, 2017, Duran went to Pierro's personal residence. Duran and Pierro spoke in Pierro's home office and, at some point, ended up in the garage. Another worker, Cristian C., was working outside and saw Duran emerge from the garage, wave goodbye, and leave. Shortly thereafter,

Cristian discovered Pierro lying on the floor of the garage, with multiple wounds to his head and face. Cristian called for help, but Pierro died before the authorities arrived.

Later that evening, Duran was stopped at a checkpoint near the border, approximately 125 miles away from Pierro's residence. When an agent attempted to divert him to a secondary inspection area, Duran sped away and led the agents on a lengthy high-speed chase, that ended in a car crash and attempted car-jacking. Duran ultimately absconded to Mexico, where he remained for approximately one year before being apprehended and returned to the United States to stand trial.

At trial, Duran admitted killing Pierro, but claimed he did so in self-defense. As a result, the prosecution and the defense presented evidence regarding the events leading up to Pierro's death and each individual's propensity for violence.

*Prosecution's Case*

Daniel C. had worked construction for Pierro for some time and was staying at Pierro's home while Pierro was out of town the weekend before the murder. He knew Duran because Duran had worked for Pierro on and off for the previous year. Daniel testified Duran came by the house on two different days that weekend and was upset because Pierro owed him money. Daniel could not recall exactly what Duran said, but it was concerning enough that Daniel warned Pierro to be careful when he returned.

David M. was a supervisor for Pierro and was at Pierro's residence briefly the morning of the murder. He saw Duran arrive shortly before he left, along with other workers, to go to a job site. David said he received a check from Pierro the previous day and tried to cash it that morning but was unable to do so. Another worker, Santos P. also testified that he and David

3

attempted to cash checks from Pierro on the morning of the murder, but the bank would not accept his check due to insufficient funds. David said he called Pierro at approximately 9:10 a.m. to inform him of the issue and, after speaking with Pierro, he was confident Pierro would ensure they received their wages.

Cristian was at Pierro's residence when the murder occurred. He knew Duran because he had seen him around the house and at social events. Pierro's house was under construction and, that morning, Cristian stayed behind to clean up while the other workers left to go to a job site. Duran arrived around the time the other workers left.

After making a trip to Starbucks, Duran and Pierro went into Pierro's bedroom. Cristian received a phone call for Pierro around 9:40 a.m. and took the phone to Pierro in the bedroom. He noted that Pierro and Duran were "just hanging out." Pierro and Duran then came back outside and worked on the stereo in Pierro's truck. Cristian could hear them talking but did not hear any arguing.

At Pierro's request, Cristian helped Duran move a folding table with tools on it. Cristian did not believe Duran was wearing gloves when they moved the table. Thereafter, Cristian went to work on the pool in the back of the house and Pierro and Duran returned to the truck.

A while later, Cristian saw Duran emerge from the garage and either say or gesture goodbye. Duran was carrying a black trash bag that was approximately halfway full over his shoulder, and his demeanor was "normal" and "calm." Approximately 7 to 10 minutes after Duran left, Cristian went into the garage and found Pierro lying on the floor. Cristian touched Pierro's stomach to confirm he was still breathing, called a supervisor to come back to the house, and then called 911.

4

Officer Pantoja with the San Diego Sheriff's Department received a dispatch at approximately 10:53 a.m. and arrived on the scene at approximately 11:00 a.m. Pierro was deceased by the time he arrived. Pantoja conducted an initial search of the garage area but did not locate any weapons.

A forensic evidence technician noted the garage where Pierro was found was quite cluttered but there was a distinct pathway to the back. There was a "fair amount of blood" in a spatter pattern around Pierro's head and on a shelf directly above him. There was a hat nearby with blood and hairs that looked similar to Pierro's embedded into the material. The placement of a wound on the top of Pierro's head was consistent with the wound being inflicted while Pierro was wearing the hat. A criminalist that examined the hat for DNA later indicated there was a blood stain inside the hat just behind the button, and the blood likely belonged to Pierro.

In the house, detectives found a number of items belonging to Duran, including mail he had received at Pierro's address. Detective Hubbert discovered a gun under a pillow in Pierro's bedroom. Detective Buckley, the lead detective at the time, concluded the gun was not particularly relevant as there was no blood on or near it, it was some distance from the murder scene, and there was no indication a gun was used in the murder.

Detective Hubbert also testified regarding the clothing Pierro was wearing when murdered and said the shorts he was wearing were very loose, such that it would be very difficult to tuck a gun into the waistband. The police conducted an extensive search but no weapon—either a gun or anything that appeared to have inflicted Pierro's wounds—was found in or near the garage.

The forensic pathologist examined Pierro's body at the scene and noted a significant amount of blunt force trauma to his face and head. The pattern of injuries was consistent with the injuries being inflicted by a hammer with significant force. A subsequent autopsy revealed that Pierro had aspirated blood throughout his lungs, which suggested he inhaled blood while struggling to breathe. He also had serious skull fractures, including depressed fractures, and bone fragments embedded in the brain tissue which likely disrupted normal brain function. The pathologist determined the cause of death was blunt force trauma to the head and certified the death as homicidal violence.

A forensic consultant reviewed the autopsy report and photographs and also concluded Pierro's injuries were inflicted by a hammer. He reviewed the blood spatter photographs and determined there was a minimum number of 12 strikes to Pierro's head and face, and that at least eight of the blows to Pierro's face occurred while Pierro was lying on the ground.

The prosecution also presented evidence of Duran's attempt to flee after the murder, and the related attempted carjacking. Agent Garcia was the primary agent at the border patrol checkpoint in Imperial County on the night of the murder. He explained that Duran arrived at the checkpoint at approximately 6:00 p.m. on June 7, 2017. A trained police dog alerted near the rear of Duran's vehicle. Duran appeared nervous and Agent Garcia thought his story was suspicious, so he directed Duran to a secondary inspection area.

Duran initially pulled up towards the area but then sped off. Agent Garcia chased after Duran, along with one or two other agents. Agent Garcia caught up to Duran within a few minutes and saw him throw an item of clothing out the driver's side window. He radioed to another agent, who then

6

retrieved a bag containing a hoodie-style sweatshirt with a pair of gloves in the pocket. Both the hoodie and the gloves had blood on them.

Duran drove erratically and Agent Garcia, who himself was driving at approximately 95 miles per hour, had a difficult time staying close to him. Approximately one hour into the pursuit, they reached the town of Julian and Duran began running stop signs. The Border Patrol Agents decided to disengage from the ground pursuit, in the interest of public safety. A helicopter continued to follow Duran for a while longer but lost visibility as it began to get dark.

At approximately 7:30 p.m., Duran lost control of the vehicle and ran through a fence and into a ditch. A witness testified that a person came out of the ditch and started running around asking for a ride "to get away." He saw something shiny in the individual's hand and believed that it was a pocketknife. The individual went up to one or two cars and pulled on the handles and attempted to open the door of an occupied vehicle that had stopped in the roadway.

Another passerby similarly testified that she saw a car stop in the road to see what was happening and saw a man matching Duran's description trying to open the driver-side door of the car from the outside. She said Duran may have had something in his hand, but she was not sure.

The police recovered a number of items from the car Duran was driving, including a duffle bag with clothes, prescriptions, and other personal items, as well as gloves and rope.

The criminalist conducted DNA testing on the sweatshirt and gloves that Duran had thrown out the car window. The sweatshirt had at least eight separate areas of blood. DNA testing indicating the blood was predominantly from a single source and there was an extremely high

7

likelihood that the source was Pierro.  One of the gloves also had a blood stain and DNA testing confirmed a very high likelihood that it was also Pierro's blood.

The forensic consultant also examined the sweatshirt and gloves and determined the blood stains were consistent with a person wearing them while "bludgeoning" Pierro with a hammer.

*Defense Case*

Duran testified on his own behalf.  He explained that he went to Pierro's residence on June 7 to retrieve mail that had been sent there and to speak to Pierro about a paycheck and documentation he needed for probation. Pierro invited him in and they went into his bedroom to talk.  Once there, Pierro pulled out a gun, told Duran "to shut up," and said, "I don't care what you want or need."  Pierro then accused Duran of working for a competitor and threatened to kill him.

Duran and Pierro left the house and went to Starbucks.  Duran asked if anyone else was going with them because he was scared to be alone with Pierro, and Pierro said no.  They returned to Pierro's residence and Pierro talked to a worker that was there.  Duran was scared but did not try to leave, despite having a car nearby, because he had been through similar situations before and thought Pierro would calm down.

Pierro called Duran back into his office and began crushing up methamphetamine on his desk.  He told Duran he needed him to clean up some tools and put them in the garage.  Pierro then consumed two lines of methamphetamine in front of Duran.  They began to walk outside but Duran became more concerned after seeing Pierro use methamphetamine so he asked if he could come back to do the work another day.  Pierro responded, "[t]he only way you're leaving from here right now is in—chopped up in this

8

body bag," and pulled a bag out from the back of his truck. Another of Pierro's workers, presumably Cristian, was outside and heard the remark. Pierro asked Duran and the worker to move a table over and, while they did so, Duran asked the worker if he thought Pierro was serious. The worker indicated Pierro was serious.

The worker went back to work on the pool and Pierro walked to his truck, retrieved the gun from the front seat, and put it on his side. Duran again indicated that he did not want to clean up the tools and Pierro got upset. He struck Duran with the gun on the left side temple, almost knocking Duran unconscious, and then grabbed Duran by the shirt and started pulling him into the garage. Duran saw a hammer on top of a bin and grabbed it as he passed by.

Pierro turned towards Duran with the gun and Duran struck Pierro with the hammer. Pierro was still holding onto Duran's shirt and the gun so Duran continued to strike Pierro with the hammer until he fell to the ground. Duran dropped the hammer, walked out of the garage, got into his car, and left. He admitted fleeing from border patrol later that day and ultimately absconding to Mexico.

Duran said Pierro had a temper and would often come to work sites and yell at him and throw things, even in front of the homeowners. Once, Pierro became so upset with a worker that he choked him to the point that the worker passed out. Another former employee, Jeremy C., said Pierro once got mad at him at a work site and pushed him away from an electrical panel that he was working on. Cristian said Pierro had a loud voice and sometimes lost his temper. He told the police he did not hear any arguments the morning of the murder, but he did hear Pierro's voice and it was loud.

Pierro's ex-wife, Kristen M., testified regarding Pierro's propensity for violence and indicated she filed for divorce because of domestic violence. In one instance, Pierro grabbed her by the throat, leaving fingerprints on her neck, and chest bumped her son in an effort to provoke him into a fight. Pierro also chest-bumped her and pushed his head against hers throughout their marriage.

On cross-examination, Daniel conceded Pierro waved a gun at him once when he jumped the fence to get onto his property, as many of the workers often did, and that he had found a gun in Pierro's truck a couple of weeks before the murder. He also testified that Pierro had a significant methamphetamine addiction, but indicated Duran also used methamphetamine with Pierro. He said Pierro was using drugs heavily around the time of the murder and had started hallucinating. A detective that interviewed Daniel on the day of the murder testified that Daniel stated, "Do I feel bad? No. I have no feeling. Another piece of shit out of this world." Daniel denied making any such statement.

The forensic evidence technician testified there was a white powdery substance on Pierro's desk as well as a straw-like object that appeared to be the casing of a pen that had been taken apart. A blood test conducted in conjunction with Pierro's autopsy was positive for methamphetamine at a level of 0.36 milligrams per liter. An expert psychiatrist, Dr. Kalish, reviewed the toxicology and autopsy reports and opined that this was a significant amount of methamphetamine. He explained that higher levels of methamphetamine cause paranoia, aggression, and hallucinations, and that regular use over an extended period of time could lead to psychosis.

The defense also pointed out inconsistencies in Cristian's story. He initially told the detectives he had not arrived at Pierro's residence until approximately 10:00 a.m. on June 7 and did not see anyone else at the house that morning before he discovered Pierro's body. Later that same day, he admitted he was at the house earlier and that he had seen Duran. He said that he initially lied because he was scared.

*Rebuttal*

On rebuttal, the prosecution presented a forensic toxicologist. She testified Pierro's methamphetamine level was within the typical range seen at the forensic toxicology lab and that one could not determine someone's behavior based solely on the level of methamphetamine in their blood. In addition, she explained that methamphetamine was known to have postmortem redistribution, wherein methamphetamine in the surrounding tissue could leach back into the blood, thereby elevating the level of methamphetamine detected in the blood postmortem.

*Verdict*

After deliberating for approximately one day, the jury found Duran guilty of attempted carjacking and first degree murder and found true an allegation that Duran used a deadly weapon, to wit a hammer, in the commission of the murder.

Duran appeals.

DISCUSSION

I. *Evidentiary Rulings*

Duran disputes a number of the trial court's evidentiary rulings, and contends the court erred by improperly excluding evidence regarding Pierro's propensity for violence while improperly admitting evidence regarding his own prior convictions and uncharged misconduct.

11

A. *Relevant Law and Standard of Review*

Typically, evidence of a person's character cannot be used to prove that the individual acted in accordance on a given occasion. (Evid. Code, § 1101, subd. (a); *People v. DelRio* (2020) 54 Cal.App.5th 47, 54 (*DelRio*).) However, there are a number of exceptions. (See *DelRio, supra,* at p. 54; Evid. Code, §§ 1101, subd. (b), 1103.)

Of particular relevance here, a defendant may offer evidence indicating the victim had a propensity for violence and was violent or aggressive at the time of the crime. (*DelRio, supra,* 54 Cal.App.5th at p. 54; Evid. Code, § 1103, subd. (a).) When, as here, a defendant in a homicide case contends they acted in self-defense, " 'evidence of the aggressive and violent character of the victim is admissible.' " (*People v. Wright* (1985) 39 Cal.3d 576, 587 (*Wright*).) "Under Evidence Code section 1103, [violent or aggressive] character traits can be shown by evidence of specific acts of the victim on third persons as well as by general reputation evidence." (*Ibid*.) In addition, as there is an objective component to self-defense claims, evidence the defendant was aware of the victim's propensity for violence, including prior threats or acts of violence, may be relevant to the defendant's state of mind during the commission of the crime. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1094 (*Humphrey*); *DelRio,* at pp. 55–56.)

The reverse is also true. If a defendant claims self-defense and offers evidence the victim was a violent person, the prosecution may counter with evidence tending to show the defendant also had a propensity for violence, and from which the jury might infer it was the defendant that acted violently. (Evid. Code, § 1103, subd. (b); *People v. Fuiava* (2012) 53 Cal.4th 622, 696 (*Fuiava*).) Similarly, although evidence of prior crimes or other uncharged misconduct cannot be used to prove propensity or a general criminal

disposition, when a defendant testifies, they place their character at issue and may be questioned regarding prior felony convictions involving moral turpitude. (*People v. Lindberg* (2008) 45 Cal.4th 1, 22 (*Lindberg*); *People v. Castro* (1985) 38 Cal.3d 301, 306, 314–315 (*Castro*); *People v. Feaster* (2002) 102 Cal.App.4th 1084, 1091; *People v. Green* (1995) 34 Cal.App.4th 165, 182.)

Evidence falling under these exceptions remains subject to Evidence Code section 352, which permits the trial court discretion to exclude evidence if its probative value is substantially outweighed by a substantial risk the evidence may cause undue prejudice or confuse or mislead the jury. (*Wright, supra,* 39 Cal.3d at p. 587; Evid. Code, § 352.)

We review the trial court's evidentiary rulings, including those regarding the admissibility of character evidence, for an abuse of discretion. (*People v. Scott* (2011) 52 Cal.4th 452, 491.)

B. *Excluded Evidence Regarding Pierro's Character*

We turn first to Duran's contention the trial court improperly excluded evidence regarding Pierro's character despite Duran's claim of self-defense.

1. *Incident with Pierro's Brother Greg*

First, Duran asserts the trial court improperly excluded evidence regarding a fight between Pierro and his brother Greg that occurred in February 2017, several months before the murder.

The prosecution filed a motion in limine regarding the incident and Greg testified in an Evidence Code section 402 hearing during pretrial proceedings. Greg explained Pierro was not doing well financially and that he and Pierro got into a "heated argument" at the business office over an insurance policy. Pierro yelled at Greg and Greg pushed Pierro, causing them both to fall over a glass table. They then ended up wrestling on the ground. Police arrived on the scene and there was a report that Pierro had

13

stabbed Greg with a pair of scissors, but Greg believed he was cut by a piece of glass from the table they fell over.

Pierro left and went home. After cleaning up the office, Greg went to Pierro's house to "make amends." Once there, he jumped over a fence to enter the property. Pierro got upset with Greg entering his property and cocked his gun, making it ready to fire. Greg lost his temper, started yelling, and "smacked" Pierro's computer. Pierro told him to get out of his house. He followed Greg outside and fired two warning shots to the side before Greg left the property. Greg said he never felt threatened and did not believe Pierro would hurt him.

Duran's counsel asserted Greg was downplaying the events to protect Pierro and that his testimony was nevertheless admissible under Evidence Code section 1103. Counsel also represented he had a one-minute long video clip of Pierro making threats, presumably to Greg, but did not play the video for the court.

After hearing Greg's testimony, and noting the investigating agency concluded there was insufficient evidence to make an arrest, the trial court determined the situation was a mutual combat situation in which Greg was the aggressor and Pierro fired the gun to make Greg leave his property. Thus, the court determined Pierro was acting in self-defense and had not committed any type of crime of violence, such that the incident did not rise to the level of admissible evidence pursuant to Evidence Code section 1103.

We find no abuse of discretion in the trial court's ruling. Based on Greg's testimony, it was reasonable for the trial court to conclude Greg was the aggressor in the incident and Pierro acted in self-defense. In addition, Greg stated Pierro shot the gun to the side and he did not believe Pierro would hurt him. Accordingly, the incident was not probative of Pierro's

14

propensity for violence and did not fall under the exception set forth in Evidence Code section 1103.

Further, even if the evidence had some tendency to show a propensity for violence, its probative value was outweighed by the prejudicial nature. If the evidence had been presented, the jury might have been improperly influenced by Pierro's otherwise lawful use of a gun, particularly since Duran claimed Pierro used a gun to threaten him on the day of the murder. (See Evid. Code, § 352; *Fuiava, supra,* 53 Cal.4th at pp. 664, 700 [trial court has discretion to limit the admission of violent propensity evidence to prevent undue prejudice and past *lawful* use of force not particularly relevant to propensity to use *unlawful* force].)

### 2. *Pierro's Firearms*

Next, Duran raises several evidentiary issues surrounding Pierro's possession and alleged manufacturing of firearms.

First, Duran contends the trial court improperly excluded that Pierro was in unlawful possession of one or more firearms. During pretrial proceedings, Duran's counsel argued Pierro's guns had been confiscated following the incident with Greg and, therefore, Pierro was not in lawful possession of the gun found in his bedroom. However, defense counsel did not present evidence to support the contention.

There was evidence the police confiscated one or more weapons from Pierro following the incident with Greg, but no charges were pressed against Pierro, and Duran presented no additional evidence indicating it unlawful for Pierro to obtain or possess another firearm following the confiscation. To the contrary, it is possible the seizure of Pierro's weapons, which occurred several months before the murder, was both temporary and related only to the weapons that were seized. (See, e.g., Pen. Code, § 18250 et seq. [describing

the procedures for temporary seizure, and subsequent return, of weapons at scene of domestic violence incident]; *Wright v. Beck* (2020) 981 F.3d 719, 732 ["Section 18275 applies to circumstances in which a firearm is seized at the scene of a domestic violence dispute."].)

The court did permit evidence regarding the gun that was found under Pierro's pillow as the gun corroborated Duran's allegation Pierro had threatened him in the bedroom earlier that morning. However, as the court explained, beyond the corroboration of Duran's story, the mere possession of firearms, lawful or otherwise, did not indicate Pierro had a propensity towards violence or that he intended to use a firearm in any particular way. (See *Staples v. U.S.* (1994) 511 U.S. 600, 611 ["despite their potential for harm, guns generally can be owned in perfect innocence"].) We find no abuse of discretion in the trial court's ruling. (See *Wright, supra,* 39 Cal. 3d at pp. 587–588 [admission of character evidence under Evidence Code section 1103 is not without bounds]; *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 449 (*Shoemaker*) [no abuse of discretion where trial court excluded propensity evidence related to charges for which victim had not yet been tried].)

Next, Duran argues Detective Buckley's statement that the gun found in Pierro's bedroom was not particularly relevant opened the door to cross-examination regarding the incident with Greg and the related confiscation. Again, though, as there was no evidence establishing Pierro was not permitted to obtain or possess another gun, neither the incident with Greg nor the confiscation notice itself imparted any particular relevance onto the gun found in Pierro's room. Further, to the extent Duran wished to cross-examine Buckley regarding the thoroughness of his investigation into the gun, separate from the incident with Greg and the confiscation notice, the court permitted him leeway to do so.

16

Similarly, Duran contends the court improperly redacted a photograph, Exhibit O, to remove an image of the notice from the sheriff regarding the confiscation. In the photograph, the notice is sitting on Pierro's desk next to the methamphetamine. As he did at trial, Duran asserts the inclusion of the sheriff's notice was intentional and its existence at the crime scene was relevant to refute Detective Buckley's statement that the gun was not relevant. However, as the trial court pointed out, the incident with Greg and the resulting confiscation of Pierro's weapons had already been excluded. Duran's counsel put the photograph into evidence in violation of the court's prior ruling—which we have already concluded was not an abuse of discretion—and, as the trial court indicated, permitting evidence regarding the confiscation would have been prejudicial and confusing absent a description of the event itself. (See Evid. Code, § 352.)

Finally, Duran contends the court improperly excluded evidence indicating Pierro was assembling or manufacturing his own firearms. Here as well, Duran did not offer proof sufficient to support the contention. Counsel relied on a witness statement that included the following: "John knew that [Pierro] had been assembling a Glock handgun to get his mind off the divorce. John stated he didn't know if he was finished assembling it or how many he has assembled because he never saw them completed." As the court noted, assembling—or potentially taking apart and re-assembling—a gun is not the same as manufacturing—or creating a gun from parts—and does not, in and of itself, indicate a propensity for violence. The trial court said it would reconsider its ruling if Duran brought in a witness that actually saw Pierro manufacturing a firearm, but Duran did not present any further evidence.

17

Accordingly, we find no abuse of discretion in the court's rulings regarding Pierro's firearms.

### 3. *Domestic Violence*

Following an Evidence Code 402 hearing, the trial court allowed Duran to present testimony from Pierro's ex-wife, Kristen, regarding domestic violence in their relationship. However, the court placed certain limits on that testimony, which Duran now contends were improper. In particular, the court said Kristen could not mention that Pierro "threw everything off [her] desk around the room" because that was not an act of violence and could not mention that certain allegations were described in a request for restraining order that she filed.

We find no abuse of discretion in those rulings. We agree with the trial court that throwing items off a desk is not meaningful evidence of a propensity for violence. The trial court's reason for excluding mention of the restraining order is less evident from the record, but, regardless, the fact that Kristen filed a request for a restraining order, in and of itself, was not particularly probative of Pierro's propensity for violence. The trial court did not preclude Kristen from talking about any underlying violent actions that were included in the filing, or that led her to file, and the prosecutor did not ask whether she reported the incidents. (See *Shoemaker, supra,* 135 Cal.App.3d at p. 449 [trial court's discretion to omit cumulative evidence upheld absent a clear showing of abuse].)

At the conclusion of her testimony, defense counsel asked Kristen about an incident involving a pillow. The prosecutor objected because there was no discussion of an incident involving a pillow during the section 402 hearing and the trial court sustained the objection. We also find no abuse of discretion in that ruling. The purpose of the section 402 hearing was to allow

18

the court to hear Kristen's testimony outside the presence of the jury in order to determine which portions were admissible. (See Evid. Code, § 402.) The court could not evaluate testimony that was not presented, and Duran's counsel did not request a sidebar or make any other attempt to discuss the potential additional testimony outside the presence of the jury.

### 4. *Testimony Regarding Pierro's Business Practices*

Duran next contends the trial court improperly precluded evidence regarding Pierro's business practices.

First, defense counsel attempted to elicit testimony from a building code inspector, Shaun D., indicating Pierro had received building code violations on many of his construction projects, and that Pierro was a "jerk" that used demeaning, demoralizing, or vulgar language with his employees. The court sustained objections to both lines of questioning as irrelevant.

Again, we find no abuse of discretion. The trial court had already admitted evidence that Pierro's business was struggling and that he was having trouble paying his workers. The fact that Pierro had building code violations was not probative of a propensity to violence and was not relevant for any other reason other than an attack on Pierro's character. (See *People v. Young* (2019) 7 Cal.5th 905, 949–950 (*Young*) [exception for violent propensity evidence does not make general character evidence admissible].) Similarly, the fact that Pierro used inappropriate language with his employees did not suggest a propensity for violence and was, likewise, an improper character attack. (*Ibid.*)

Duran also points out that the prosecutor said he would object to similar testimony from Jeremy C. regarding Pierro's business practices. The trial court never made a ruling with respect to Jeremy's testimony, though, as Duran's counsel did not argue the point or ask the question to Jeremy.

19

The court did indicate it did not believe testimony regarding threats Jeremy had allegedly heard Pierro and Duran make to one another was admissible and Duran's counsel agreed to move on. To the extent the court's statement could be construed as a ruling, we would find no abuse of discretion. Counsel indicated the threats were made approximately one year before the murder and both Pierro and Duran each made threats to one another. Thus, the testimony was not particularly probative of either's propensity for violence or state of mind on the day of the murder.

### 5. *Hallucinations*

Finally, Duran asserts the trial court improperly limited testimony regarding Pierro's hallucinations.

Daniel testified Pierro was using a lot of drugs and had started hallucinating. Duran's counsel asked him, "what kind of hallucinations would he have, in your opinion?" The prosecutor objected to relevance and lack of foundation, and the court sustained the objection.

We find no abuse of discretion in the court's ruling. There was no foundation indicating Daniel had the ability to identify the "kind" of hallucinations Pierro was having. (See *People v. Caro* (2019) 7 Cal.5th 463, 503 ["A lay witness must have personal knowledge of the facts to which he or she testifies."].) Regardless, the court permitted evidence that Pierro had been abusing drugs and was having hallucination prior to the murder, that Pierro had a relatively high level of methamphetamine in his blood on the day of the murder, and that methamphetamine can cause hallucinations. Daniel's lay opinion regarding the kind of hallucinations Pierro was having had minimal probative value in light of this other evidence.

C. *Evidence Regarding Duran*

Despite extolling the importance of evidence concerning Pierro's character, Duran next contends the trial court erred by allowing evidence concerning his own propensity to violence.

### 1. *Duran's Use of Methamphetamine*

First, Duran asserts it was improper for the prosecutor to cross-examine him regarding his own drug use and, in particular, his use of methamphetamine with Pierro. However, it was Duran who put drug use into issue by presenting evidence that Pierro used methamphetamine on the morning of his death. Duran argues his own drug use was not relevant because there was no evidence that he was under the influence of methamphetamine that day, but that was, at least in part, because he fled following the murder, preventing law enforcement from determining whether he was under the influence. The fact that Duran may have been using methamphetamine with Pierro, including on the day of the murder, was relevant for all the same reasons that it was relevant whether Pierro was doing so.

### 2. *Duran's Prior Convictions*

Next, Duran argues the trial court should not have allowed the prosecutor to ask him about an auto theft conviction from 2006, a domestic violence conviction in 2009, and an assault in 2015. These were all admissible as prior felonies involving moral turpitude and the latter two were also admissible as showing a propensity for violence.[1] (See *Lindberg, supra,* 45 Cal.4th at p. 22; *Castro, supra,* 38 Cal.3d at pp. 306, 314–315; *People v.*

---

[1] We note that the trial court properly exercised its discretion and excluded another prior for human smuggling based on its potential for prejudice given the heightened atmosphere surrounding immigration at the time of trial.

*Hunt* (1985) 169 Cal.App.3d 668, 675 [auto theft is a crime involving moral turpitude]; Evid. Code, § 1103, subd. (b).)

Further, Duran made some attempt to evade law enforcement, either resisting arrest or fleeing, after each of the admitted crimes. In the present case, Duran conceded he fled after killing Pierro but said he did so because he was scared. Accordingly, evidence he had a pattern of evading the police following unlawful activity directly refuted his own testimony and, thus, undermined his credibility. Duran asserts the evidence was not particularly relevant to his state of mind on the day of the murder, but that is beside the point, as it was nevertheless relevant and admissible for these other reasons.

Duran also contends the prosecutor's cross-examination concerning the details of his previous domestic violence was prejudicial because the prosecutor referred to him beating, punching, choking, and kicking his girlfriend. Although graphic, those details were highly probative of his propensity for physical violence, which was squarely at issue, and, in any event, they were no more graphic than Duran's admitted actions of repeatedly hitting Pierro in the face and head with a hammer. (See *People v. Poplar* (1999) 70 Cal.App.4th 1129 [evidence of prior acts of domestic violence not prejudicial where violence was no more inflammatory than the crime at issue].) Thus, they were relevant and admissible under Evidence Code section 1103, subdivision (b) and not barred by Evidence Code section 352.

3. *Evidence Regarding the Border Patrol Chase*

Finally, Duran contends the trial court erred by allowing evidence regarding the high-speed chase with border patrol and that narcotics were thrown out of the car during the pursuit.

As an initial matter, the narcotics were mentioned only briefly and were relevant to the reason border patrol initially stopped Duran, as well as

the assertion that Duran used drugs along with Pierro both in general and on the day of the murder.

Regarding the chase itself, Duran was charged with attempted carjacking in relation to the pursuit. It was reasonable for the court to allow some evidence regarding the pursuit, as the evidence indicated the motive behind the attempted carjacking was to continue evading border patrol. Duran argues the jury was misled to believe Duran's state of mind *after* the murder was relevant, but evidence of consciousness of guilt *is* relevant, and fleeing certainly demonstrates a consciousness of guilt. (See *People v. Anderson* (2018) 5 Cal.5th 372, 391 ["Evidence showing consciousness of guilt, such as flight or escaping from jail, is generally admissible within the trial court's discretion."]; *People v. Merriman* (2014) 60 Cal.4th 1, 62–63 [post-murder behavior demonstrating consciousness of guilt carries significant probative value].)

Accordingly, we find no abuse of discretion in the trial court's evidentiary rulings regarding evidence related to Duran.

D.  *The Trial Court's Evidentiary Rulings Were Not Prejudicial*

Even if we were to find error in the trial court's evidentiary rulings, we would conclude any such error was not so prejudicial as to require reversal.

Duran asserts the evidentiary rulings violated his constitutional right to a fair trial by depriving him of his right to present a complete defense and his right to cross-examine witnesses. He therefore contends the standard of prejudice set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) is applicable. Under *Chapman*, reversal is required unless any error was harmless beyond a reasonable doubt. (*Chapman*, at p. 24.) Assuming, without deciding, the weightier *Chapman* standard applies, we

conclude any abuse of discretion in the trial court's evidentiary rulings was harmless beyond a reasonable doubt.

First, the evidence of guilt was overwhelming. Duran admitted to repeatedly bludgeoning Pierro with a hammer. He claimed he did so in self-defense, but to prove either perfect or imperfect self-defense, Duran had to prove he had an actual, genuine fear of imminent peril. (See *Humphrey, supra,* 13 Cal.4th 1082; *In re Christian S.* (1994) 7 Cal.4th 768, 773 (*Christian S.*).) Duran claimed Pierro threatened and hit him with a gun, but there was no gun found in or near the garage where the murder happened, and no evidence one had been removed. In addition, Christian testified there was no apparent conflict between Duran and Pierro leading up to the murder and said Duran's demeanor was "normal" and "calm" as he walked away from the garage.

Moreover, there was evidence Duran hit Pierro approximately eight times in the face with the hammer even after Pierro fell to the ground. Afterwards, Duran did not tell Cristian what had happened and did not take any other steps to help Pierro, as he lie on the garage floor dying. Instead, Duran drove to the border and evaded border patrol on a lengthy high-speed chase. He then absconded to Mexico, where he remained for approximately one year before being apprehended and returned to the United States to stand trial.

Duran asserts the probative value of the excluded character evidence was high because there were no independent witnesses and no real motives for murder. Thus, whether Pierro was the aggressor was a key issue and evidence that he was violently aggressive, quick to anger, and had access to multiple illegal firearms was directly on point. We agree that evidence of Pierro's propensity for violence was relevant and admissible, but the trial

court permitted a significant amount of evidence of that nature, including evidence that Pierro had a temper and would throw things at workers, that Pierro choked a worker until he almost passed out, that Pierro engaged in domestic violence with his ex-wife, and that Pierro was using significant amounts of methamphetamine and hallucinating in the day leading up to the murder. As discussed, *ante*, in section I.B., the additional character evidence the trial court excluded was cumulative and not particularly probative of Pierro's propensity for violence, especially when compared to the evidence that was admitted. (See *Shoemaker, supra,* 135 Cal.App.3d at p. 449; *Young, supra,* 7 Cal.5th at pp. 949–950.)

Duran contends the excluded evidence at issue here was similar to the evidence excluded in *DelRio*, and the court in *DelRio* concluded the exclusion was not harmless. (*DelRio, supra,* 54 Cal.App.5th at pp. 54, 57.) To the contrary, the evidence at issue in *DelRio* related to a series of domestic violence incidents, including at least one that involved choking. (*Id.* at p. 54.) Here, as in *DelRio*, the trial court permitted testimony regarding domestic violence perpetrated by Pierro as well as other incidents where Pierro was physically aggressive. By contrast, the excluded evidence did not involve physical violence and, in the case of the incident with Greg, was not probative of a propensity for violence because Pierro was acting lawfully and in self-defense. Thus, if anything, the trial court's evidentiary rulings in this case were consistent with the appellate court's analysis in *DelRio*.

Duran further contends the prosecutor compounded the error by pointing out there was no evidence of "Pierro being this awful human being" and, in fact, Pierro was "not so scary." As discussed, the court did permit testimony regarding Pierro's history of domestic violence and at least two incidents where he was physically aggressive with workers. What the trial

court excluded was inadmissible character evidence, or evidence that Pierro was simply an "awful human being." While it may have been part of the defense strategy to characterize Pierro as such, a verdict based on such a general characterization would have been improper.

With respect to the evidence admitted against Duran, he contends the verdict was not close because the jury asked two questions about the attempted carjacking charge, and thus there is a likelihood the jury was improperly influenced by evidence of his character. As an initial matter, we note the jury took less than one full day to deliberate on all charges and asked no questions regarding the murder charge, or the related self-defense instructions. Regardless, the evidence concerning Duran's prior felonies and other uncharged conduct was not any more influential than the evidence presented regarding Pierro's past acts of violence and use of methamphetamine.

As discussed, the evidence of guilt was overwhelming, and there is no real probability that the competing character evidence, and in particular any of the evidence that Duran now contends was improperly admitted or excluded, had any significant impact on the verdict. Accordingly, we conclude any error in the trial court's evidentiary rulings was harmless beyond a reasonable doubt.

II. *Jury Instructions*

Duran contends the trial court erred with respect to several jury instructions, including with respect to the duty to retreat, heat of passion voluntary manslaughter, and unanimity of the verdict.

A. *Relevant Legal Principles and Standard of Review*

"When a defendant bases his contention of innocence on particular facts, he is entitled to have the jury instructed on the general law as it relates

to those facts, if he submits proper instructions thereon." (*People v. Terry* (1970) 2 Cal.3d 362, 402.)  However, "the court need not give a pinpoint instruction if it is argumentative, merely duplicates other instructions, or is not supported by substantial evidence." (*People v. Hartsch* (2010) 49 Cal.4th 472, 500.)

We review challenges to the jury instructions under a de novo standard of review and independently assess whether the instructions as a whole correctly stated the law.  (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Tate* (2010) 49 Cal.4th 635, 686.)  Likewise, in determining whether an instructional error related to state law is prejudicial and requires reversal, we apply the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), and consider whether there is a reasonable probability the jury would have reached a verdict more favorable to the defendant absent the error.  (*People v. Falsetta* (1999) 21 Cal.4th 903, 925.)  We consider a disputed instruction in light of the entire charge to the jury and determine whether there is a reasonable likelihood the jury misunderstood and misapplied the instruction with the understanding that the jurors are intelligent and capable of understanding all of the given instructions.  (*People v. Moore* (2011) 51 Cal.4th 1104, 1140; *People v. Lopez* (2011) 198 Cal.App.4th 698, 708; *Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

B. *Analysis*

1. *Duty to Retreat*

The trial court instructed the jury with a modified version of CALCRIM No. 505, explaining the circumstances under which the jury could conclude Duran acted in lawful self-defense.  Duran's counsel did not object to the instruction the trial court proposed and did not request any modifications or additions.

27

Duran now claims that the trial court should have included—and defense counsel should have requested—the following optional paragraph in CALCRIM No. 505 regarding the duty to retreat:

> "A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of [death/great bodily injury] has passed. This is so even if safety could have been achieved by retreating."

As the additional language is akin to a pinpoint instruction, the trial court had no sua sponte duty to provide the instruction absent a request from counsel. (See *People v. Saille* (1991) 54 Cal.3d 1103, 1120; *People v. Hudson* (2006) 38 Cal.4th 1002, 1012 [" 'a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "].) However, since Duran also raises an ineffective assistance of counsel argument, we consider whether it would have been appropriate for the trial court to give the instruction if Duran's counsel had requested it.

An instruction on the lack of a duty to retreat is not required in the absence of evidence the defendant "considered retreating but chose not to do so" or "could have retreated but did not do so." (*People v. Pruett* (1997) 57 Cal.App.4th 77, 89.) Here, Duran continually asserted that, by the time he developed a genuine fear of imminent harm, he had no ability to retreat. (See *Humphrey, supra,* 13 Cal.4th at p. 1082; *In re Christian S., supra*, 7 Cal.4th at p. 773.)

Specifically, Duran testified he initially was not too concerned about Pierro's threats or behavior and believed he could calm Pierro down because he had been through similar situations with him in the past. It was only

once Pierro made the comment about the body bag that Duran believed there was a real threat of imminent harm, but at that point, he did not believe he could leave. According to Duran, Pierro was never more than 20 feet away and had a gun, and, thus, Duran believed Pierro would shoot him if he attempted to leave. Shortly thereafter, Pierro allegedly hit Duran with the gun and began dragging him into the garage. At that point, Duran said his legs were weak from the hit and he could not get away. Accordingly, Duran's own testimony indicated he never considered or believed he had a choice to retreat, and therefore negated the need for the optional, additional language regarding the duty to retreat.

Regardless, there is not a reasonable probability the jury would have reached a verdict more favorable to Duran if the trial court had provided the additional language regarding the duty to retreat. (*People v. Falsetta* (1999) 21 Cal.4th 903, 924.) Given the totality of the court's other instructions on self-defense, we find it highly improbable that the jury would have concluded self-defense was not applicable simply because Duran did not attempt to leave. The jury was also instructed regarding voluntary manslaughter based on imperfect self-defense but still found Duran guilty of first degree murder, indicating they did not believe he actually believed he was in imminent danger. (*Humphrey, supra,* 13 Cal.4th at p. 1082 [both perfect and imperfect self-defense require proof of an actual, genuine fear of imminent peril].) Thus, it appears the jury did not credit Duran's testimony and instead credited the overwhelming evidence supporting the prosecution's theory that Duran deliberately killed Pierro with malice aforethought. (See *People v. Lewis* (2001) 25 Cal.4th 610, 646 [an instructional error "is harmless when the jury necessarily decides the factual questions posed by the omitted

instructions adversely to defendant under other properly given instructions"].)

Duran argues the prosecutor suggested he should have retreated, but the prosecutor's questions appear, instead, to question the veracity of Duran's timeline and version of the events. Duran also points to the prosecutor's statement, "If there's an option to leave, then we do not have to use immediate force, and any other reasonable person would have believed that." When read in context, the prosecutor was not asserting that Duran had a duty to retreat and was instead questioning whether Duran had an actual and reasonable belief that he needed to use immediate force. Again, when read in that context, the argument was consistent with the omitted instruction, which states the defendant may stand their ground *until* the danger of death or great bodily harm has passed. If Duran did not actually believe Pierro posed a threat of imminent harm, it did not matter whether he had a duty, or attempted, to retreat.

Finally, Duran compares this case to *People v. Rhodes* (2005) 129 Cal.App.4th 1339 (*Rhodes*). There, the trial court instructed the jury with CALJIC No. 12.50 "Use of a Firearm by Convicted Felon—Self-Defense,"[2] but

---

[2]    CALJIC 12.50 states:
"A person previously convicted of a felony does not violate section [12021] [29800] of the Penal Code [or any of its subdivisions] by being in possession of a firearm if:
"1. [He] [She] as a reasonable person had grounds for believing and did believe that [he] [she] was [or] [others were] in imminent peril of great bodily harm; and
"2. Without preconceived design on [his] [her] part, a firearm was made available to [him] [her];
"3. [His] [Her] possession of such firearm was temporary and for a period of time no longer than that in which the necessity or apparent necessity to use it in self-defense continued; and

30

refused to give CALJIC No. 5.50, "Self-Defense—Assailed Person Need Not Retreat,"[3] in part because Rhodes was a convicted felon and the use notes for CALJIC No. 12.50 indicated CALJIC No. 5.50 should not be given if the defendant was previously convicted of a felony.  (*Rhodes*, at pp. 1343–1344.) The appellate court determined the trial court erred because CALJIC No. 12.50 is to be used only when a defendant was charged with violating then Penal Code section 12021, and Rhodes was not charged under section 12021. (*Id*. at pp. 1345–1346.)  In that context, the court further determined CALJIC No. 5.50 would have been appropriate, in part because Rhodes testified that he was going to drive away but did not because one of the victims had a gun and he was afraid they would shoot him.  (*Id*. at p. 1346.)  The court then went on to determine the *cumulative effect* of "giving CALJIC No. 12.50, not giving CALJIC No. 5.50, and the district attorney's emphasis on the trial court's erroneous instruction of the law was prejudicial."  (*Id*. at p. 1348.)

Here, as discussed, and unlike *Rhodes*, Duran never indicated he considered retreating but decided not to.  Moreover, even if we were to

---

"4. The use of the firearm was reasonable under the circumstances and was resorted to only if no alternative means of avoiding the danger were available."

[3]     CALJIC 5.50 states:
"A person threatened with an attack that justifies the exercise of the right of self-defense need not retreat. In the exercise of [his] [her] right of self-defense a person may stand [his] [her] ground and defend [himself] [herself] by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge; and a person may pursue [his] [her] assailant until [he] [she] has secured [himself] [herself] from danger if that course likewise appears reasonably necessary. This law applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene."

conclude Duran's testimony was sufficiently similar to support the inclusion of the duty to retreat language, Duran does not assert the trial court provided an entirely inaccurate instruction like the court did in *Rhodes*. (See *Rhodes, supra*, 129 Cal.App.4th at p. 1348.) To the contrary, and notwithstanding Duran's assertion regarding the duty to retreat language, the trial court here provided an otherwise complete and accurate set of instruction on both perfect and imperfect self-defense.

### 2. *Heat of Passion*

Next, Duran asserts the trial court erred by failing to instruct the jury on heat of passion voluntary manslaughter.

The trial court has an obligation to instruct the jury on voluntary manslaughter based on sudden quarrel or heat of passion if the associated defense theory is supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 160 (*Breverman*); *People v. Rogers* (2006) 39 Cal.4th 826, 866; *People v. Young* (2005) 34 Cal.4th 1149, 1200.) Evidence is substantial so long as a reasonable jury could find it persuasive. (*People v. Young,* at p. 1200.) The trial court determines whether there is substantial evidence to support a given instruction without reference to the credibility of the evidence but is not obligated to give an instruction based solely on conjecture or speculation. (*Ibid*.)

A reduction of a charge from murder to voluntary manslaughter based on sudden quarrel or heat of passion requires both subjective and objective findings. (*Breverman, supra*, 19 Cal.4th at p. 163.) The defendant must have acted with obscured judgment due to a provocation by the victim *and* the provocation must have been sufficient to cause a person of average disposition to act rashly and without due deliberation. (*Ibid*.; see also *People*

*v. Steele* (2002) 27 Cal.4th 1230, 1252–1253 [defendant must prove adequate provocation and actual heat of passion].)

Here, the trial court determined an instruction on voluntary manslaughter was not appropriate because, while Duran testified that he feared for his life, he never indicated he was provoked. Both the prosecutor and defense counsel agreed, and substantial evidence supports the court's conclusion.

Duran denied being mad or upset at Pierro on the day of the murder, because of the money Pierro owed him or Pierro's actions that day. Duran did say he was scared for his life, but he did not suggest at any time that his fear caused him to act rashly or without due deliberation. To the contrary, he explained how the situation unfolded throughout the day and how he initially believed he could calm Pierro down. Further, he explained how he first tried to push Pierro off so he could get away and began looking around for a weapon only once he realized that was not working. He saw the hammer was accessible and made a conscious choice to use it to defend himself. Duran said he continued to strike Pierro after the first blow because Pierro did not release his grip on Duran's shirt or the gun and Duran did not want to get shot. Consistent with Duran's own account, Cristian testified Duran's demeanor was "normal" and "calm" immediately after the murder.

Duran points out that the prosecutor asserted he was angry during closing arguments, but the prosecutor said that Duran was angry *before* he got to the house that day as part of her argument that Duran went there with the intent to murder Pierro. Setting aside the fact that attorney argument is not evidence, the prosecutor's theory as set forth in closing arguments did not support an inference that Pierro provoked Duran to the point of acting irrationally, and did not support a heat of passion instruction.

33

Duran asserts *People v. Thomas* (2013) 218 Cal.App.4th 630 is instructive. In *Thomas*, the defendant and the victim had been involved in a dispute over a parking space for some time, they had quarreled earlier that day, and there was testimony indicating the defendant was upset and said, "I'm going to get this motherfucker" right before shooting the victim. (*Id.* at pp. 634–635.) In addition, the defendant himself testified he was "afraid," "nervous," and "just wasn't thinking clearly." (*Id.* at pp. 639–640.) The appellate court indicated, although the "facts may fit more precisely with a homicide mitigated by imperfect self-defense, we cannot rule out that they may also show that Thomas was guilty only of voluntary manslaughter because when he shot [the victim] his passion was aroused and his reason was obscured due to a sudden quarrel."[4] (*Id.* at p. 645.)

To the contrary, here, Duran said Pierro threatened him and he feared for his life, but there was no evidence of a quarrel leading up to the murder and, although Duran testified in his own defense, he did not state or suggest that he was not thinking clearly or that his reasoning was obscured by anger, fear, or any other emotion when he killed Pierro. As such, the perfect and imperfect self-defense instructions were warranted, but the heat of passion voluntary manslaughter instruction was not.

Moreover, even if the court erred by failing to give a heat of passion instruction, we would conclude the error was harmless. Despite the general rule regarding prejudice for instructional errors, Duran asserts the failure to

---

4     Similarly, in *People v. Millbrook* (2014) 222 Cal.App.4th 1122, which Duran also relies upon, there was evidence the victim had engaged in belligerent and threatening conduct throughout the day, had purposefully escalated a fight with the defendant, and had insulted or threatened the defendant's girlfriend immediately before the defendant shot him, and the defendant testified the situation was "very intense" and "he panicked." (*Id.* at pp. 1130, 1134, 1141.)

instruct on a lesser included offense violates the defendant's constitutional rights to due process and a fair trial and therefore must be analyzed according to the more stringent standard of prejudice set forth in *Chapman*. (See *Thomas, supra,* 218 Cal.App.4th at p. 633; but see also *Breverman, supra,* 19 Cal.4th at pp. 168–169 [doubting whether the lesser included offenses implication the federal Constitution despite being derived from state law].) Assuming without deciding that the *Chapman* standard applies, we would find the error here was harmless beyond a reasonable doubt. (See *Chapman, supra,* 386 U.S. at p. 24.)

The jury was instructed on perfect and imperfect self-defense and second degree murder, but found Duran guilty of first degree murder. Thus, the verdict suggests the members of the jury did not believe Duran's assertion that he was acting out of fear when he attacked Pierro with the hammer, regardless of whether that fear was rational. Duran contends, even if the jury concluded Duran did not believe he needed to strike Pierro with the hammer to defend himself—regardless of whether *that* belief was reasonable—they still could have concluded Pierro did so out of unconsidered reaction to Pierro's provocation. Again, though, there was no evidence Duran was influenced by any emotion other than fear, and if the jury believed Duran feared for his life, whether that belief was rational or not, there is no apparent reason they would not have accepted that he also, whether rationally or not, believed he needed to strike Pierro with the hammer in order to escape the threat.

Duran asserts the evidence of first degree murder was weak because there was no evidence of pre-conceived plot to kill Pierro, and that his weapon of choice, the hammer, suggests a spontaneous reaction. As an initial matter, it was not necessary for Duran to have plotted to kill Pierro prior to arriving

at his residence that day.  It is well recognized that the intent to kill, even when based on cold, calculated judgment, can develop in a brief interval. (See *People v. Solomon* (2010) 49 Cal.4th 792, 812.)  Regardless, there was evidence Duran came to the house the weekend before the murder looking for Pierro, and Daniel testified he was concerned enough by Duran's words to warn Pierro to be careful when he returned.  The fact that the jury convicted Duran of first degree murder, instead of second, indicates they concluded the murder was, in fact, premeditated and deliberate, as opposed to irrational or without due deliberation.  (See *Millbrook, supra,* 222 Cal.App.4th at p. 1138 [a jury finding that an attempted murder was willful, premeditated, and deliberate "would have been 'manifestly inconsistent with having acted under the heat of passion' "].)

### 3. *Unanimity*

Finally, Duran contends the trial court improperly instructed the jury on the need for unanimity in the verdict.

Specifically, the court modified CALCRIM No. 640 to include the following language from CALJIC 8.74:  "Before you may return a verdict in this case, you must agree unanimously not only as to whether the defendant is guilty or not guilty, but also, if you should find him guilty of an unlawful killing, you must agree unanimously as to whether he is guilty of murder of the first degree or murder of the second degree or voluntary manslaughter. However, *you are not required to agree unanimously on the theory of guilt*."  Duran contends this indicated to the jurors that they did not need to agree unanimously whether the murder was first or second degree murder.

36

Again, defense counsel did not object or seek any modification to the instruction, such that the issue was likely forfeited, but we nevertheless consider the merits since Duran also raises an ineffective assistance of counsel argument.

As an initial matter, the instruction provided by the court was legally accurate. The California Supreme Court has expressly confirmed a jury must unanimously agree only on the *degree* of murder, but not the *theory* under which murder was proven. (*People v. Taylor* (2010) 48 Cal.4th 574, 626; *People v. Jennings* (2010) 50 Cal.4th 616, 639 [" 'A jury may convict a defendant of first degree murder, however, without making a unanimous choice of one or more of several theories proposed by the prosecution' "].)

Further, the court in *People v. Webb* (2018) 25 Cal.App.5th 901 directly addressed a similar contention. There, the jury was instructed with a version of CALCRIM No. 548 that stated:

> "The defendant has . . . been prosecuted for murder under two theories: (1) malice aforethought, and (2) felony murder. [¶] Each theory of murder has different requirements, and I will instruct you on both. [¶] You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories. You do not all need to agree on the same theory, but you must unanimously agree whether the murder is in the first or second degree." (*Id.* at p. 906.)

The appellate court noted the instruction expressly stated unanimity was required as to "degree" but found there was some ambiguity because the instruction also referred to malice aforethought and felony murder as different "theories." (*Webb, supra,* 25 Cal.App.5th at p. 907.) Here, as in *Webb*, the instruction explicitly stated, "you must agree unanimously as to whether he is guilty of murder of the first degree or murder of the second degree or voluntary manslaughter." However, as felony murder was not at

issue in the case, there was no similar reference to malice aforethought and felony murder as different "theor[ies]." Accordingly, there was no ambiguity in the instruction, and we presume the jurors understood they had to unanimously agree on the degree, as instructed. (*Ibid*.; see also *People v. Lopez, supra,* 198 Cal.App.4th at p. 708 ["Instructions should be interpreted, if possible, to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation"].)

In addition, the jury was also instructed on first degree and second degree murder, and those instructions stated, "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder." Given the totality of instructions, there is no reasonable possibility that the members of the jury did not understand that they had to unanimously decide whether Duran was guilty of first degree, as opposed to second degree, murder.

Further, even if there were some ambiguity in the instruction, we would conclude any error was harmless. Duran complains that the jurors were only given a single verdict form that set the degree as first degree murder and asserts this compounded the error. To the contrary, the court also explicitly instructed them, "If *all* of you cannot agree whether the defendant is guilty of first degree murder, inform me that you cannot reach an agreement and do not complete and sign any verdict form on that count." [emphasis added.] Thus, the trial court once again made clear that the jury had to unanimously agree Duran was guilty of first degree murder. The fact that the jury did not inform the court that they could not reach an agreement

on that charge indicates that they did, in fact, unanimously agree that Duran was guilty of murder in the first degree.

III. *Prosecutorial Misconduct*

Next, Duran contends the prosecutor committed prejudicial misconduct during closing arguments by misstating the burden of proof, disparaging defense counsel, and misstating the evidence.

A. *Relevant Legal Principles and Standard of Review*

Prosecutors have wide latitude to argue their case vigorously during closing arguments but may not use deceptive or reprehensible methods to persuade the jury. (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*); *People v. Tully* (2012) 54 Cal.4th 952, 1009–1010 (*Tully*).) A prosecutor's conduct violates the federal constitution and requires reversal when it infects the trial with such unfairness as to deny the defendant due process. (*People v. Powell* (2018) 6 Cal.5th 136, 172.) Further, even if the conduct does not meet the federal standard, it may still require reversal under California state law if it employs deceptive or reprehensible methods to attempt to persuade the jury. (*Ibid.*)

However, " '[t]o prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 772.) When reviewing the prosecutor's statements on appeal, we do not infer that the jury drew the most damaging meaning possible but consider how a reasonable juror would, or could, have understood the allegedly improper comments in the context of the entire argument. (*Ibid.*; *People v. Benson* (1990) 52 Cal.3d 754, 793.)

B. *Forfeiture*

To preserve a claim of prosecutorial misconduct for appeal, defense counsel must make a timely objection and request an admonition to cure any harm in order. (*People v. Riggs* (2008) 44 Cal.4th 248, 298.) Here, it is undisputed that defense counsel did not object or request any admonition to the jury. Accordingly, Duran has forfeited his arguments regarding prosecutorial misconduct on appeal. However, because Duran asserts his counsel provided ineffective assistance of counsel by failing to object, we will address the merits of his prosecutorial misconduct claim in the context of determining whether his counsel erred by failing to object. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 146 [court may exercise discretion to consider forfeited claims to forestall ineffective assistance of counsel arguments].)

C. *The Prosecutor's Comments Do Not Arise to the Level of Misconduct*

1. *Burden of Proof*

Duran first asserts the prosecutor committed misconduct by misstating CALCRIM No. 224 and effectively lowering the burden of proof.

The trial court instructed the jury with CALCRIM No. 224, which states:

> "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

> "Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence ·is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

The prosecutor discussed this instruction, and the use of circumstantial evidence more generally during closing arguments, and stated:

> "Circumstantial evidence, if you recall, are facts from which you may logically and reasonably conclude the truth of the fact in question. It's making those logical inferences from the evidence before you and comparing it to the testimony, to see what really happened. You can only accept reasonable conclusions.
>
> "I spent a lot of time on this in voir dire because this is extremely important. You cannot accept unreasonable conclusions and you cannot speculate. So you can't wonder about the mystery man that there's no evidence of. You can't wonder about things that may or may not possibly be. You have to look at the evidence before you and, again, not speculate.
>
> "The same applies for reasonable doubt. Reasonable doubt is similar to circumstantial evidence, where you make reasonable inferences. You look at all the evidence before you. You don't look at each piece individually. You look at the totality, the whole picture and you make these reasonable conclusions. And at the end of it, do you have an abiding conviction about what happened? Again, you need not eliminate all possible doubt, and you do not speculate."

Duran argues the prosecutor improperly conflated reasonable doubt and circumstantial evidence and misled the jury to believe they could convict based on "reasonable inferences" and "conclusions." We disagree. When read in context, and along with the instruction provided by the court, a reasonable juror would understand that the prosecutor was simply explaining that they could not rely on unreasonable inferences that did not make sense when considering the totality of evidence to overcome reasonable doubt. Moreover, the prosecutor ended the discussion by telling the jury they must have an abiding conviction, which is consistent with the proof beyond a reasonable doubt standard.

41

Duran asserts the prosecutor's statement was similar to the flawed analogy presented by the prosecutor in *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*). In *Centeno*, the prosecutor showed the jury a map of California with multiple inaccuracies but pointed out that, despite the obvious errors, there was no reasonable doubt that the state on the map was California. (*Id*. at p. 665.) She then told the jury that they could, similarly, find the defendant guilty even if there was missing or inaccurate information, and that they should reject any possible but unreasonable alternatives and make a reasonable decision based on the totality of the evidence. (*Id*. at pp. 665–666.) On appeal, the California Supreme Court concluded the use of the map constituted prejudicial misconduct, in part because the prosecutor misstated the burden of proof by creating "the impression that so long as [the prosecutor's] interpretation of the evidence was reasonable, the People had met their burden." (*Id*. at p. 672.)

Here, the prosecutor was essentially making the opposite argument, pointing out that the jury could not find reasonable doubt based on unreasonable inferences from limited pieces of circumstantial evidence. This was permissible argument. (*Centeno, supra,* 60 Cal.4th at p. 672 ["It is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory."].) Given the totality of the instructions to the jury and the prosecutor's argument, we do not believe a reasonable juror was misled regarding the requisite proof beyond a reasonable doubt burden.

2. *Prosecutor's Commentary on Evidence of Pierro's Character*

As discussed, Pierro's character and alleged propensity for violence was a central issue throughout the trial. During closing argument, the prosecutor suggested the defense attempted to "dehumanize" Pierro and stated:

"When Mr. Crawford got up in his opening statement, he made Mr. Pierro sound like a monster; described an incident to where he almost pushed him into—pushed a gentlemen [sic] into an electrical box, almost killing him. You heard from Jeremy [C.]. He shoved him aside because he didn't like the work he was doing. He didn't try to hurt him. You heard no evidence from anyone, other than Mr. Duran, about Mr. Pierro being this terrible, awful human being.

"So why did it come in? So that you wouldn't care about him when he died. Well, Mr. Pierro was a human being, and nothing that he did in his past warranted what happened to him."

Duran contends this line or argument was improper for several reasons. First, he asserts the prosecutor disparaged defense counsel by asserting the defense improperly characterized Pierro as a bad person. To the contrary, although the prosecutor was critical of the *theory* presented by the defense, nothing in the prosecutor's argument was disparaging of defense counsel. The prosecutor did not accuse defense counsel of lying or attempting to deceive the jury. (Compare *People v. Young, supra,* 34 Cal.4th at p. 1193 [accusing counsel of lying to jurors]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1302 [accusing counsel of deceiving jurors], abrogated on other grounds in *People v. Merritt* (2017) 2 Cal.5th 819, 831.) Statements that attack a defense theory, as opposed to defense counsel, are permissible. (*People v. Redd* (2010) 48 Cal.4th 691, 749 ["The prosecutor's remarks, however, attacked the defense theory, not defense counsel's integrity, and did not constitute denigration of counsel."].)

Next, Duran contends the argument was improper because it took unfair advantage of rulings by the trial court excluding additional character evidence regarding Pierro, and because it unfairly appealed to the jurors' passions. Again, we disagree. As discussed, *ante*, in section I., the trial court did allow the defense to present relevant, admissible evidence of Pierro's

43

propensity for violence. Specifically, with respect to the electrical box incident, to which counsel was referring, Jeremy initially suggested Pierro shoved him *into* the electrical box but, on cross-examination, conceded Pierro actually shoved him to the side. The prosecutor was merely pointing out that the evidence suggested Pierro was not as violent as the defense claimed, and that he did not do anything that warranted the attack. There was nothing improper about that argument. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1343 ["fair comment on the evidence and did not suggest 'that emotion may reign over reason' or invite 'an irrational, purely subjective response' "].)

Finally, Duran contends the argument improperly misstated the evidence because there was, in fact, additional evidence regarding Pierro's propensity for violence. As an initial matter, defense counsel was certainly permitted to argue the same during closing arguments and the jury was capable of weighing the evidence and the related arguments. Regardless, evidence of an individual's propensity for violence is a distinct subset of character evidence and the exception in Evidence Code section 1103 does not permit the defense to present general character evidence. Thus, to the extent the defense suggested there was evidence Pierro was an "awful or terrible person," that argument was arguably improper, and, in any event, the prosecutor was certainly within her right to argue the opposite. In doing so, the prosecutor was entitled to assert the evidence that was presented was not sufficient to establish Pierro was a "terrible, awful human being" or that he had a propensity for violence.

### 3. *Assertion Pierro Was Hit on the Back of the Head*

Duran also contends the prosecutor misstated evidence by stating the "first blows were to the back of [Pierro's] head," despite the trial court previously pointing out the evidence indicated the blows were to the top of

44

Pierro's head.  To the contrary, there was evidence the bloodstain on the inside of the hat was behind the button on top and, after a dispute between counsel regarding whether the evidence indicated Pierro was hit on the top of the head or the "top rear," the court stated:  "That's the [prosecutor's] interpretation.  Jurors, you heard the testimony.  Use your own interpretation of the evidence."  Accordingly, the prosecutor was entitled to argue that Pierro was hit on the "back" as opposed to "top" of his head, and it was up to the jurors to consider the totality of evidence and to reach a conclusion regarding the alleged fact.

### 4. *Use of "Honestly" Regarding Imperfect Self-Defense*

Finally, Duran contends the prosecutor committed misconduct by using the word "honestly" in the following explanation of imperfect self-defense: "So imperfect self-defense:  Instead of reasonably believed, it's that the defendant honestly and actually believed that he was in imminent danger of being killed, and that instead of reasonably believing that he needed to use immediate force, that he honestly and actually believed that he needed to use immediate force and one of those beliefs was unreasonable."

The words "honest" and "actual" have long been used interchangeably to describe the subjective belief element of imperfect self-defense.  (*In re Christian S., supra,* 7 Cal.4th at p. 773.)  The term "actual" is now preferred, and used in CALCRIM No. 571, to avoid "the confusing suggestion inherent in the phrase 'honest belief' that a person could have a 'dishonest belief,' i.e., that a person could believe something he does not believe."  (*In re Christian S.,* at p. 773.)  However, here, the jury was also instructed with CALCRIM No. 571, and there was nothing in the prosecutor's argument that suggested Duran's beliefs were somehow "actual" but not "honest."  Thus, the prosecutor's argument was appropriate and, in any event, we find it

extremely unlikely that the prosecutor's brief use of the phrase "honestly and actually" confused the jurors.

IV. *Ineffective Assistance of Counsel*

Duran asserts his trial counsel provided ineffective assistance of counsel by failing to request certain jury instructions and failing to object to the alleged prosecutorial misconduct.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) A defendant claiming ineffective assistance of counsel has the burden to show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *Ledesma*, at pp. 216, 218.)

Prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra,* 466 U.S. at p. 694.) Accordingly, we will reverse a conviction on appeal based on ineffective assistance of counsel only where "the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions." (*People v. Lucas* (1995) 12 Cal.4th 415, 442; see also *People v. Anderson* (2001) 25 Cal.4th 543, 569.)

Here, the record is insufficient to establish Duran received ineffective assistance of counsel. First, Duran asserts his counsel was ineffective to the extent he failed to request the jury instructions or failed to object to the prosecutorial misconduct discussed, *ante*, in sections II and III. We have

addressed the merits of each of these asserted errors, regardless of any alleged forfeiture, and have concluded in each instance that there was no prejudicial error. Accordingly, Duran cannot meet his burden under *Strickland* to establish the result of the proceedings would have been different absent any such error on behalf of his counsel. (See *Strickland, supra,* 466 U.S. at p. 694.)

In addition, Duran asserts his counsel should have requested a limiting instruction that the jury should consider the evidence regarding Duran's uncharged conduct only in evaluating Duran's self-defense claim. He asserts it was improper for the jurors to use that evidence in evaluating the attempted carjacking charge, and that there was no tactical reason for his counsel not to request such an instruction. We disagree.

As an initial matter, Duran does not identify the specific language of the instruction he asserts his counsel should have requested, making it difficult to evaluate the necessity of any such instruction. Regardless, the jury was instructed evidence of prior felonies or other misconduct could be considered only in evaluating Duran's credibility. Thus, there is no reason to believe the jury considered the evidence in an improper manner and, to the contrary, any further instruction on the issue may have served only to highlight the connection between the murder, Duran's violent nature, and the attempted carjacking. (See *In re Hill* (2011) 198 Cal.App.4th 1008, 1016 [counsel's tactical decisions entitled to deference].)

Accordingly, Duran has not established a claim for ineffective assistance of counsel.

V. *Cumulative Error*

Duran asserts, even if no single error standing alone is sufficient to require reversal, the cumulative effect of the alleged errors does require

47

reversal. The cumulative error doctrine applies when the "the cumulative effect of the errors . . . makes[s] it 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error[s].' " (*Johnson v. Tosco Corp*. (1991) 1 Cal.App.4th 123, 141; see also *Hill, supra,* 17 Cal.4th at p. 847 [concluding sheer number of errors was so troubling as to require reversal].) Here, we have found no errors and, thus, there can be no cumulative error. Further, for the reasons already discussed herein, we would conclude, even if there were any individual errors, those errors were not prejudicial, individually or as a result of the cumulative effect.

VI. *Sealed Transcript*

Finally, Duran asks us to independently review a sealed pretrial transcript regarding the admissibility of certain evidence.

Several months before trial, the prosecutor requested that the trial court review certain evidence that had not been provided to Duran or his counsel to confirm the evidence was properly withheld pursuant to Penal Code section 1054.7. A defendant typically bears the burden to provide a record on appeal that affirmatively establishes error (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549), but in cases such as this, where the records are sealed, the defendant is not able to review the records to analyze or establish the existence of error. Accordingly, we have independently reviewed the sealed proceedings. We find no error therein.

48

## DISPOSITION

The judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:

IRION, J.

DO, J.